UNITED STATES *v.* INTERNATIONAL HARVESTER CO. (No. 3867)[1]

[1] T. D. 47715.

United States Court of Customs and Patent Appeals, April 29, 1935

*Joseph R. Jackson*, Assistant Attorney General (*Francis J. Hogan*, special attorney, of counsel), for the United States.
*James R. Ryan* for appellee.

[Oral argument April 16, 1935, by Mr. Jackson and Mr. Ryan]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

LENROOT, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, Third Division, sustaining the protest of appellee.

The involved merchandise, hereinafter described, was classified by the collector at the port of Chicago under the provisions of paragraph 1403, Tariff Act of 1930, and assessed with duty at the rate of 30 per centum ad valorem. Appellee protested said classification and assessment of duty, claiming that the involved merchandise was free of duty under the provisions of paragraph 1807 of said act, or, alternatively, that it was dutiable under paragraph 1547 of said act at the rate of 20 per centum ad valorem.

The trial court held the merchandise to be free of duty as an original painting under paragraph 1807, as claimed by appellee.

The paragraphs of said act herein involved read as follows:

PAR. 1403. Filter masse or filter stock, composed wholly or in part of wood pulp, wood flour, cotton or other vegetable fiber, 20 per centum ad valorem; indurated fibre ware, masks composed of paper, pulp or papier-mâché, and manufactures of papier-mâché, not specially provided for, 25 per centum ad valorem; manufactures of pulp, not specially provided for, 30 per centum ad valorem.

PAR. 1807. Original paintings in oil, mineral, water, or other colors, pastels, original drawings and sketches in pen, ink, pencil, or water colors, artists' proof etchings unbound, and engravings and woodcuts unbound, original sculptures or statuary, including not more than two replicas or reproductions of the same; but the terms "sculpture" and "statuary" as used in this paragaph shall be understood to include professional productions of sculptors only, whether in round or in relief, in bronze, marble, stone, terra cotta, ivory, wood, or metal, or whether cut, carved, or otherwise wrought by hand from the solid block or mass of marble, stone, or alabaster, or from metal, or cast in bronze or other metal or substance, or from wax or plaster, made as the professional productions of sculptors only; and the words "painting," "drawing," "sketch," "sculpture," and "statuary" as used in this paragraph shall not be understood to include any articles of utility or for industrial use, nor such as are made wholly or in part by stenciling or any other mechanical process; and the words "etchings," "engravings," and "woodcuts" as used in this paragraph shall be understood to include only such as are printed by hand from plates or blocks etched or engraved with hand tools and not such as are printed from plates or blocks etched or engraved by photochemical or other mechanical processes.

PAR. 1547. (a) Works of art, including (1) paintings in oil or water colors, pastels, pen and ink drawings, and copies, replicas, or reproductions of any of the same, (2) statuary, sculptures, or copies, replicas, or reproductions thereof, valued at not less than $2.50, and (3) etchings and engravings, all the foregoing, not specially provided for, 20 per centum ad valorem.

\*        \*        \*        \*        \*        \*        \*

The merchandise consists of an article described in the record as a "diorama" entitled "Cotton Picking," which was exhibited at the Century of Progress Exhibition at Chicago. The "diorama" was not introduced in evidence, but a photograph of the same was admitted over the objection of the Government as Illustrative Exhibit A.

While we have grave doubt that the involved article is a diorama under the common meaning of that word, it will, for the sake of convenience, be so termed in this opinion.

The diorama has two outstanding features, a background representative of the sky, and a scene in a cotton field. The dimensions of the diorama, according to the testimony of one of appellee's witnesses, are 6 or 7 feet wide, 3 or 4 feet high, and about 3 or 3½ feet in depth. The scene in the cotton field consists of the following: a roadway, made of wood or some composition material, extending from the front of the diorama to the base of the sky-background; real cotton or some material resembling cotton; modelled figures consisting of a representation of an automobile truck loaded with bales of cotton, a theoretical cotton picking machine, a house and outbuildings, and modelled figures of men and women in the act of picking cotton in the ordinary manner. All of the foregoing objects were made of some material and painted over, except that the figures of the men and women, other than the faces and hands, are covered with actual clothes. It was conceded by appellee's counsel that if the diorama is not a work of the free fine arts the material of chief value is pulp, as found by the appraiser.

Three witnesses testified on behalf of appellee; the Government offered no testimony.

The first witness for appellee was one Armel, who testified that he was the import and export manager of appellee. He described the involved diorama as follows:

Q. Will you describe it as best you can to the court, in your own words, but as succinctly as possible?—A. It is a painting showing—a painting in oil, in partial relief, on a fiber board or pulp, or some kind of similar material for a background, with a decorated mineral earth base, in the foreground, and painted figures in full relief illustrating the old and the theoretical new system of cotton picking; the hand cotton picking on the one side and the theoretical, mechanical cotton picking on the other.

Q. What do you mean by the term "theoretical mechanical cotton picking"?—A. I mean there is no cotton picker on the market today. That is something for the future. There is no mechanical cotton picker.

Upon cross-examination the witness testified as follows:

X Q. You spoke of this as a painting. These figures on here of these individuals picking cotton, are they painted on or are they made out of some pulp or some other material?—A. They are stained and colored.

\*          \*          \*          \*          \*          \*          \*

X Q. If you know, what are those figures made of?—A. They are made of some composition.

X Q. The cotton on there, is that painted on there or is it made of some material or composition to represent cotton?—A. In the foreground that is material.

X Q. Is it real cotton, do you know?—A. I do not know. I think it is.

X Q. This instrument here, or piece of machinery, represented on one side of illustrative exhibit A; is that made of some material, or is it painted on there?—A. It is made of material.

X Q. This automobile truck in the center of the road, is that painted on there, is it made of some material?—A. It is in full relief. It is made of material.

X Q. So that the only part that is painted, so far as this illustrative exhibit A is concerned, is the skyline and the bill; is that correct?—A. No, sir.

X Q. Will you detail on that what is painted on there?—A. There is painted coloring used over all of it.

X Q. This roadway; is that made of some material?—A. Yes, sir; and painted.

X Q. Painted over?—A. Yes, sir.

X Q. Is this skyline, is that painted on canvass?—A. It is painted on, I think, fiber board.

X Q. But there is no material to bring out the clouds?—A. The background is in three degrees.

X Q. So that the sky is the only thing that is a real painting? All of these others are made up of materials and then painted over?—A. Yes, sir.

Upon redirect examination said witness testified as follows:

Q. Mr. Witness, do you know the measurement of this article, illustrative exhibit A?—Approximately; yes.

Q. What is the entire approximate measurements? How long and how high and how wide?—A. It is about 6 feet or 7 feet wide.

Q. That is lengthwise here?—A. Yes, sir; and it was between, as I remember it, about between 3 or 4 feet high, and it is about 3 or 3½ deep.

Q. In the 3½ feet of depth how much of that is taken up by the skyline at the top of the hill here?—A. Approximately half of that surface.

Paul Proehl testified that he was a commercial artist. He described the involved diorama as follows:

\* \* \* The background of this diorama is a landscape, and the sky painted on something. I don't know what it is. I did not examine it closely enough. It is either canvas or board painted with oil or temporal color, and the foreground is made up of some material that is modeled and painted over. The figures are dressed, I believe, in cloth. This cotton-picking machine on the left, I would think, was made of wood, because it is carved out, and I believe this automobile in the roadway is also made of either wood or composition. That is my knowledge of this picture here.

The third witness for appellee, Emory P. Seidel, a professional sculptor and painter, did not describe in detail the involved diorama.

The witness Armel also testified that the diorama was made by one T. Ivester Lloyd; that the witness had met him several times in Chicago and knew that he was a recognized artist, and that some of his works were on exhibition and offered for sale in Chicago. He further testified as follows:

Q. Do you know of your own knowledge whether or not the painting illustrated by illustrative exhibit A is the work of the artist, the original work of the artist?—A. Yes, it is.

Q. Mr. Armel, will you tell the purpose, if you know, of the obtaining or importing the painting represented by illustrative exhibit A?—A. It was painted as one of the series illustrating the progress of agriculture from the hand age to the mechanical age, for exhibition at the Century of Progress exhibition.

Q. Did your firm, if you know, give the artist detailed instructions as to how he was to draw or paint or produce the picture?—A. No. He submitted sketches, and we accepted.

Upon cross-examination the witness stated that he did not see the artist do any part of the work on the diorama.

The witness Seidel testified with respect to the diorama as follows:

* * * This piece is a good composition. It is nicely painted, right straight throughout. Whether some parts are in—whether he used different materials on there does not make any difference. The complete picture is painted. All of those parts that are on there practically are covered with paint, and it makes one complete picture.

Said witness further testified that he considered the diorama a work of the fine arts.

The witness Proehl also testified as follows:

Q. Did you form any opinion as to whether the painting represented by illustrative exhibit A did or did not fall within that class of arts known as free fine arts?—A. I did not form any opinion of it.

Mr. HIGGINBOTHAM. That is all.

Judge SULLIVAN. No, maybe it is not all.

Mr. HIGGINBOTHAM. He was asked whether he formed an opinion on it and he said no.

The WITNESS. I think the definition of fine arts should be—

Mr. HIGGINBOTHAM. I will object to the definition of fine arts. He was asked did he form any opinion.

Judge SULLIVAN. Answer the question asked.

Mr. RYAN. He has answered.

By Mr. RYAN:

Q. Have you now any opinion as to whether or not the painting represented by illustrative exhibit A falls within that class of the arts known as free fine arts?—A. No; I can't answer that, unless you tell me what you mean by fine arts.

Q. Well, as you understand the term "free fine arts", in the light of your training as an artist?—A. I would say today it was not. I would say in the future it may be. Fine arts is something that is determined very often by the scarcity of the subject, or the future appreciation of it.

The trial court held that the involved diorama is an original painting, entitled to free entry under paragraph 1807 of said tariff act.

In its decision it stated, with respect to the relief work upon the diorama, as follows:

\* \* \* The evidence fails to establish that the relief work on this article was carved or molded as the professional production of a sculptor. If produced by any mechanical process, sculptures and paintings are expressly excepted from the privilege of free entry under paragraph 1807. While there is nothing in the record from which we might infer that any part of this importation was produced by mechanical process, we do not believe the evidence introduced warrants classification of this article as a sculpture, as that term has been defined in the case of *United States* v. *Olivotti*, 7 Ct. Cust. Appls. 46, T. D. 36309.

In appellee's brief we find the following statement:

From a reading and consideration of paragraph 1807, *supra*, it is obvious that, if the judgment below, sustaining the protest, is to be affirmed, the record must contain a preponderance of the evidence that the painting herein is a work of the free fine arts. In view of recent decisions in this Court (*O. O. Friedlander Co.* v. *United States*, 19 Ct. Cust. Appls. 198; *Alexander & Oviatt* v. *United States*, 21 Ct. Cust. Appls. 97, and *A. Ackerman & Sons* v. *United States*, 21 Ct. Cust. Appls. 329), the same is likewise true if the alternative claim in the protest, that the merchandise is dutiable at 20 *per centum ad valorem*, as a work of art, under the provisions of paragraph 1547, *supra*, be sustained.

We regard the foregoing as a correct statement of the law, and the only question before us is whether the diorama here involved is a work of the free fine arts.

We are clear that it is not an original painting, as held by the trial court. We agree with the trial court that the evidence does not establish that the figures forming a part of the diorama are the professional production of a sculptor.

Webster's New International Dictionary defines "painting", as that word is used in the fine arts, as follows:

b. *Fine arts*. The work of the painter; representation or depiction of objects or scenes in color on a surface by means of pigments, generally applied with a brush; also, any work of art so produced.

The New International Encyclopaedia, Vol. XV, p. 215, under the title "Painting," states:

In the fine arts, the representation by means of color and line upon a flat surface, of objects of nature and of the imagination. According to the flat surface used, painting may be mural, panel, easel, etc. \* \* \* As regards the materials used the principal varieties of painting are encaustic, fresco, pastel, tempera, water color (qq. v.), oil, and stereochrome. \* \* \*

The latter definition may be somewhat more restrictive than would meet with our approval in view of some of our decisions. However, in the case of *Frei Art Glass Co.* v. *United States*, 15 Ct. Cust. Appls. 132, T. D. 42214, we had under consideration, among others, paragraph 1704, Tariff Act of 1922, which is identical, so far as paintings are concerned, with paragraph 1807, Tariff Act of 1930. This court in that case, speaking through Presiding Judge Graham, said:

\* \* \* If the imported articles are to be included within paragraph 1704, it must obviously be under the designation of "Original paintings in oil, mineral, water, or other colors." While there is testimony to the effect that these mosaics are called "mosaic paintings," they are obviously not made by the use of oil, mineral, water, or other colors. *This language refers to the laying of such colors upon à surface by a painter.* \* \* \* (Italics ours.)

In the case of *United States* v. *Ehrich*, 22 C. C. P. A. (Customs) 1, T. D. 47019, we said:

The courts, so far as we are advised, when called upon to construe provisions of tariff acts relative to works of the fine arts, have always entertained the view that the fine arts are such as are principally exemplified by painting and sculpture. The Supreme Court, in *United States* v. *Perry*, 146 U. S. 71, expressed its views thus, in making an analysis of the distinctions between works of art and art objects, under the Tariff Act of October 1, 1890:

For most practical purposes works of art may be divided into four classes:
1. The fine arts, properly so called, intended solely for ornamental purposes, and including paintings in oil and water, upon canvas, plaster, or other material, and original statuary of marble, stone, or bronze. These are subject to a duty of 15 per cent.
2. Minor objects of art, intended also for ornamental purposes, such as statuettes, vases, plaques, drawings, etchings, and the thousand and one articles which pass under the general name of bric-a-brac, and are susceptible of an indefinite reproduction of the original.
3. Objects of art, which serve primarily an ornamental, and incidentally a useful purpose, such as painted or stained glass windows, tapestry, paper hanging, &c.
4. Objects primarily designed for a useful purpose, but made ornamental to please the eye and gratify the taste, such as ornamented clocks, the higher grade of carpets, curtains, gas-fixtures, and household and table furniture.

Since the rendition of that opinion, this court has been called upon on numerous occasions, to construe similar provisions of succeeding tariff acts. In none of these cases have any of these statutory provisions ever been extended to cover anything further than such works of the free fine arts as are specifically named in the same, such as paintings and sculpture, or, latterly, etchings or drawings. \* \* \*

With respect to the diorama in question, the evidence establishes that the only part of the article that involved painting within the meaning of that word as used in the fine arts is the part representing the sky, which is a minor part of the article. The dominant portion of the diorama is the cotton picking scene, hereinbefore described. The painting over of certain of the figures in the cotton scene was presumably within the skill of an artisan. Thus it is clear that the diorama falls far short of being a painting, as that term is used in the fine arts, and we must hold that it is not a painting within the meaning of the words "Original paintings in oil," etc., as used in paragraph 1807, Tariff Act of 1930; nor is it a work of art, as claimed by appellee within the meaning of those words as used in paragraph 1547 of said act.

Inasmuch as the only claims of appellee's protest were under said paragraphs 1807 and 1547, we hold that the Customs Court *erred* in sustaining appellee's protest, and its decision is *reversed*.